IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2013 Term

_____

No. 13-0591

_____

FILED

November 14, 2013

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

MARK V. H.,
Respondent Below, Petitioner

v.

DOLORES J. M.,
Petitioner Below. Respondent

_____

Appeal from the Circuit Court of Putnam County
The Honorable Phillip M. Stowers, Judge
Civil Action No. 11-D-516

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED, WITH
DIRECTIONS

_____

Submitted: November 5, 2013
Filed: November 14, 2013

Mark V. H.
Dunbar, West Virginia
*Pro se*

Dolores J. M.
Hurricane, West Virginia
*Pro se*

The Opinion of the Court was delivered PER CURIAM.

JUSTICE KETCHUM concurs, in part, and dissents, in part, and reserves the right to file
a separate opinion.

SYLLABUS BY THE COURT

1. "In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*." Syl., *Carr v. Hancock*, 216 W. Va. 474, 607 S.E.2d 803 (2004).

2. "In visitation as well as custody matters, we have traditionally held paramount the best interests of the child." Syl. pt. 5, *Carter v. Carter*, 196 W. Va. 239, 470 S.E.2d 193 (1996).

3. "In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. pt. 2, *State ex rel. Lipscomb v. Joplin*, 131 W. Va. 302, 47 S.E.2d 221 (1948).

4. "Equitable distribution under W. Va. Code, 48-2-1, [now 48-7-103] et seq., is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets. The third step is to divide the marital estate between the parties in accordance with the principles contained in W.

Va. Code, 48-2-32." Syl. pt. 1, *Whiting v. Whiting*, 183 W. Va. 451, 396 S.E.2d 413 (1990).

Per Curiam:

This is the appeal by Mark H. of the May 3, 2013, order of the Circuit Court of Putnam County in his divorce proceeding. The Circuit Court of Putnam County affirmed in part and reversed in part the January 22, 2013, order of the Family Court of Putnam County. Based upon the pleadings of the parties, the record designated for review and the arguments of the parties, and for the reasons stated herein, we affirm that portion of the circuit court order that affirmed the rulings and decision of the family court in regard to equitable distribution. We reverse the Circuit Court of Putnam County insofar as it reversed the family court's allocation of custodial responsibility to the Husband and reinstate the well-reasoned and legally supported order of the family court in its entirety.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

The petitioner, Mark H. ("Husband"),[1] and the respondent, Dolores M. ("Wife"), were married in Putnam County on August 29, 1998. The Wife filed a divorce action against the Husband in November of 2011, although the parties resided in the same household until March of 2012. One child was born of this marriage on August 29, 2007.

---

[1] In cases involving sensitive facts, this Court adheres to our usual practice of referring to the parties and other individuals by their initials. *See State v. Edward Charles L.*, 183 W.Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

1

The underlying proceedings were contentious and prolonged, in large part because of the numerous filings by the Husband. We need not detail the protracted nature of the proceedings, but we note that substantial attorney fees were awarded to the Wife by the presiding family court judge, Mike Kelly.

After many days of hearings, the family court entered a forty-one page order on January 22, 2013, that granted the parties a divorce on the grounds of irreconcilable differences. The order extinguished any claim that the Husband had to the former marital home and denied his request for reimbursement for improvements made during the course of the marriage. The Wife was designated the custodian of the parties' child. The Husband was granted parenting time with the child every other Saturday and Sunday, beginning at 9 a.m. and ending at 8 p.m., with no overnights. The Husband was prohibited from taking the child from the State of West Virginia. Relying upon the Wife's testimony and the psychiatric and psychological evaluations introduced into evidence, the family court reasoned that allowing the child to spend any more time with the Husband would subject the child to potential danger in the future because of the Husband's propensity to initiate conflict with other persons. Child support was awarded to the Wife in the amount of $613.37 per month.

The Husband appealed this order to the Circuit Court of Putnam County. The Husband asserted the following assignments of error: (1) the family court's award of

2

custody of the child to the Wife, as well as limitations on his visitation; (2) the family court's award of attorney fees and costs to the Wife; (3) the family court's equitable distribution related to the value of the marital home; (4) the family court's failure to award him the value of improvements made to the marital home and (5) the family court's failure to include the Wife's business income and failure to consider the reduction in the Husband's business income for calculation of child support. In a twenty-page order entered on May 3, 2013, the circuit court affirmed most of the family court's rulings, with the exception of the limitations on the Husband's visitation with the child. The circuit court found that the family court abused its discretion when it limited the Husband's visitation because of potential conflicts with other persons. The circuit court reversed the family court's visitation time, and ordered that the Husband have parenting time with the child every other weekend, beginning at 6 p.m. on Friday and ending Sunday at 8 p.m. The circuit court also authorized the Husband to take the child out of state, contingent upon the Wife being notified at least one week prior to the trip, the trip not interfering with school and the Husband and child returning home on the same day.

The Husband timely appealed this order to this Court.

## II.

## STANDARD OF REVIEW

This Court's well-established standard of review of domestic relations proceedings was set forth in the syllabus of *Carr v. Hancock*, 216 W. Va. 474, 607 S.E.2d 803 (2004).

> In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*.

We also note that complicating this appeal were numerous pleadings and documents filed by the self-represented Husband that did not relate to the order being appealed.[2] This Court has weeded through many pleadings that relate to matters

---

[2] We note, for example, that the Husband's pleadings are often repetitive and not necessarily on point for the subject task. The memorandum brief filed by the Husband is styled as being in support of a motion for expedited hearing on Husband's appeal, when it is in fact the brief in support of his appeal. Contained therein are a number of allegations, some of which are pertinent to the present appeal, but many relate to the various modification attempts of the family court's order and contempt proceedings in this matter. There are many references to matters not contained in the record, including references to postings by the Husband in his Internet blog. The New Oxford American Dictionary 183 (3rd Ed. 2010) defines a blog as "a personal website or webpage on which an individual records opinions, links to other sites, etc., on a regular basis."

The record also contains a number of nonsensical pleadings, including a document entitled "Order of Sanctions" authored by the Husband, in which the Husband "orders" in part that the presiding judge pay to the Husband and his son an incredible and unimaginable sum of money for various perceived wrongs to the Husband. For one such "infraction," the Husband demands that Judge Kelly pay "one million trillion dollars" for

(continued . . .)

4

occurring after date of the order being appealed, including additional citations for contempt against the Husband and the Husband's petitions for modifications and contempt.

---

being a "total [sic] corrupt, arroganrt [sic], incompetent jackass." For failing to require the Wife to undergo a psychological evaluation, the Husband attempts to impose a $999 trillion per day sanction on the Wife for every day since the exam was ordered.

This particular document was accompanied by a document entitled "Order of Lien and Garnishment" in which the Husband attempts to encumber Judge Kelly's home (identified by address) and attach his wages as payment of the aforesaid "Order of Sanctions."

On June 18, 2012, the Chief Justice of this Court entered an administrative order regarding the Husband's pattern and practice of directly e-mailing the Justices, sending text messages to the Justices' mobile telephones and making telephone calls (some of them to the Justices' home telephones) regarding the pending divorce case and especially Judge Kelly. In this order, the Husband was directed to "comply with the appropriate court rules, none of which permit litigants to contact court officials via personal telephone calls, e-mails, or text messages." The order further ordered that "any future telephone calls, e-mails, e-mail attachments or text messages from [the Husband] to court officials in this State may be disregarded." Finally, this order directed that "any further communications from [the Husband] to court officials or employees of the court system that are vexatious, frivolous, or do not comply with the terms of this order will be referred to the appropriate authorities for possible criminal prosecution."

Despite these shortcomings, we believe the record is adequate for the purposes of our review of the Husband's appeal.

5

### III.

### ANALYSIS

The Husband's three areas of appeal are as follows: (1) allocation of custodial responsibility of the parties' child to Wife; (2) equitable distribution of the marital estate; and (3) failure of the Wife to undergo a psychological evaluation as ordered by the family court. We will address each area separately.

### A.

### Allocation of custodial responsibility

In its final order, the family court allocated parental responsibility to the Wife over the objections of the Husband. The Husband was granted visitation with his child every other Saturday and Sunday for a set period of time with no overnights. The Husband was also prohibited from taking the child out of state. The family court found that it would be harmful to the parties' child to have further parenting time with the Husband.[3] The family court relied upon the Wife's testimony, the psychiatric and psychological evaluations of the Husband and the Husband's conduct during the pendency of these proceedings in allocating parenting time.

---

[3] The temporary order entered in the beginning of this case had granted additional parenting time to the Husband in the form of a mid-week visit. Hence, the final order represented a reduction in the Husband's time with the child.

6

## 1. The Wife's testimony

The Wife argued for restrictions on the Husband's parenting time, citing the Husband's diagnosed personality disorder and his "inability to control his impulse to generate interpersonal conflict." The Wife detailed the Husband's numerous arrests,[4] anecdotal incidents of outbursts at hotels with his family present, and "sustained harassment of private individuals and companies as well as various public officials and entities."

The family court order noted that the Husband's and Wife's application to become foster parents was denied because of the Husband's behavior. The family court found that the Wife was concerned "not that [the Husband] will directly harm [the child], but that he will create conflict with third parties which might scare or alarm or traumatize [the child] or place the young child in reasonable apprehension of bodily harm caused by others, or, [the Husband] is arrested yet again, might result in the child being placed in the temporary care of unknown private or public third parties until [the Wife] can retrieve him."

---

[4] The family court found that the Husband was arrested in 2007 for making harassing, obscene and threatening phone calls. In 2008 the Husband was arrested for trespassing and assault. In 2009 the Husband was arrested for trespassing. In October of 2012, at the conclusion of the first day of his final divorce hearing, the Husband was arrested for making harassing phone calls. During his psychological evaluation by Dr. Hudson, the Husband stated that these arrests were "small-town retaliation against reporters."

## 2. Psychiatric and psychological evaluations

A psychological evaluation of the Husband was conducted by Clifton R. Hudson, Ph.D., in 2012. Dr. Hudson's evaluation included reviewing a 2008 psychiatric evaluation of the Husband performed by Daniel Thistlethwaite, M.D.,[5] in an unrelated civil litigation instituted by the Husband and Wife seeking damages against a major retailer that built a store near the parties' home in Putnam County.

The family court order noted that in 2008, Dr. Thistlethwaite found that the Husband had a personality disorder, not otherwise specified, with narcissistic and paranoid traits. He also found that the Husband was malingering, with significant symptom exaggeration on psychological instruments designed to reveal exaggeration of cognitive deficits. He concluded that there was no evidence that the Husband was suffering from a psychiatric illness as a result of stress caused by the construction of a retail outlet near his home. However, Dr. Thistlethwaite found that the Husband "has been distressed, upset and angered by what he perceives as improper due process and believe that he is the target of the authorities. All of this is the result of a severe personality disorder which predates any of the alleged stressors."

Dr. Thistlethwaite also found that [the Husband]'s "psychological profile and behavior would suggest that he has a propensity for aggressive behavior. No history

---

[5] Throughout the underlying orders, Dr. Thistlethwaite's name is spelled Thistlewaite.

of overt violence is found; however, given his degree of agitation and volatility noted during our examination, any threats made by [the Husband] should be taken seriously and dealt with appropriately." Dr. Thistlethwaite also found that the Husband "sees little need for changes in his behavior."

Dr. Hudson's evaluation of the Husband made similar conclusions, including a finding that the Husband has a personality disorder, not otherwise specified. Dr. Hudson's conclusions were not the same as Dr. Thistlethwaite's regarding the Husband's potential for violence. While Dr. Hudson found that the Husband likely posed no direct threat of harm to the child, he was concerned that the Husband's continued interpersonal conflicts presented an increased risk of harm. Dr. Hudson found:

> [The Husband's] clinical interview was most significant for an apparent pattern of conflictual interpersonal relationships. While [the Husband] frames these in terms of his tenacity in standing up for his own rights and those of his family, it appears that he has a persistent tendency to allow his emotions to dictate certain aspects of his behavior, resulting in circumstances counterproductive to his own stated goals. He appears lacking in awareness of his own contribution to these conflicts, instead focusing on his perceptions of the inappropriate behavior of others and his expectations that others should treat him fairly even when he has angered them. It appears likely that [the Husband] will continue to generate interpersonal conflict and that his son will ultimately have some degree of exposure to that conflict.

Dr. Hudson's opinion differed with that of Dr. Thistlethwaite regarding the Husband's potential for harm to the child because of his personality disorder. Dr,

Hudson stated that "while it is true that personality disorder characteristics such as those that Dr. Thistlethwaite observed . . . constitute a risk factor for violence," this would be one of many such factors and in isolation could not be construed as "significantly elevating violence risk in an individual without a known history of significant violence." He noted that while the Husband's past behavior was the most valid indicator of future behavior, he saw no sign that the Husband's current behavior placed the parties' son in danger of mistreatment.

### 3. The Husband's conduct during these proceedings

During the pendency of these proceedings, the family court was exposed to evidence of the Husband's personality disorder. Eighteen pages of the final order are devoted to the Husband's conduct during this time. The family court found that the husband's personality disorder became "even more bizarre, irrational and divorced from reality" as the divorce proceeding continued. Judge Kelly found that the Husband's "mental unraveling" began with the entry of an uncontested temporary order on January 27, 2012, that contained the admonition that the Husband could not remove the child from the State of West Virginia without the family court's written permission. The restriction was made part of the temporary order because of the Husband's diagnosed personality disorder.

Throughout these proceedings, the Husband has referred to Judge Kelly and his court by pejorative names.[6] The family court detailed these names as well as many events and incidents involving the Husband's behavior during the pendency of these proceedings. One such event happened on April 27, 2012, when the Husband submitted a fabricated letter to this Court, ostensibly from Judge Kelly, in which Judge Kelly appeared to resign from office.[7]

---

[6] The Husband has stated that Judge Kelly "writes checks his brain cannot cash"; "is a menace to society that should be imprisoned"; "is the poster child for a lifetime admittance to Mildred Mitchell Bateman," a state-run hospital for the mentally ill; is a "wacky judge"; is a "so-called judge"; "ignores reality"; "is anti-children, anti-fathers and anti-reality"; "is subhuman excrement"; "has refused to recuse his sorry self from this case and has refused to step down from the bench as he is incompetent and an embarrassment to the legal profession" among other statements.

[7] The letter, as included in the final order, was addressed to the Clerk of this Court and stated as follows:

> I Michael J. Kelly have violated the rights of [the child] and [the Husband.] I allowed [the Wife's counsel] to repeatedly lied (sic) in court. I refused to allow [the Husband] to correct [the Wife's counsel's] lies and improperly threatened to throw [the Husband] out of a conference call hearing. I have repeatedly refused to correct my improper temporary order. I violated [the child's] right to a Spring Break vacation in Myrtle Beach. I am an embarrassment to the legal profession. Therefore, I immediately vacate my temporary order. I award [the Husband] the marital home and full custody of [the child] immediately. I then resign my position as Kanawha County Family Court judge due to my incompetency and arrogance. I agree to move to another state and never practice law or hold public office again.

The disdain and rage of the Husband toward this Court, the entire court system and especially toward Judge Kelly, has permeated a majority of his self-filed pleadings. The Husband has made a number of impossible-to-achieve and nonsensical requests and demands of the Family Court and this Court during the course of these proceedings. The following is not an exhaustive list, but illustrative of the Husband's conduct: (1) that Judge Kelly reincarnate his deceased mother so that she, the Husband and the child may have a final visit; (2) that after Judge Kelly reincarnates the Husband's deceased mother, that he pay for a trip for the Husband and his son to visit with her; (3) that Judge Kelly build a zoo in West Virginia and move the Atlantic Ocean to the State of West Virginia; and (4) that Judge Kelly pay for trips to amusement parks and other attractions for the Husband, his child, the child's classmates and his teachers.

The family court found that the Husband's personality disorder not only surfaced during the course of this litigation but that the Husband's behavior became "even more bizarre, irrational and divorced from reality as the case progressed, leading the Court to conclude that the risk that [the Husband] will become violent." The family court's final order detailed page after page of the Husband's demands and requests of this Court. Also detailed in the final order are incidents of name-calling of the Wife's

counsel, Judge Kelly, and other persons who became involved in this case, such as members of the Judicial Investigation Commission.[8]

## 4. Analysis of the lower courts' orders

On the basis of all this evidence, the family court found that the parties' child should live primarily with the Wife. The Wife was awarded all decision-making authority, including the right to limit or eliminate the Husband's contact with day care providers, day care centers, schools, churches, doctors' offices or other service providers.[9] The Husband was allocated parenting time every other weekend, for a set period of time on Saturday and Sunday, with no overnight visitation. Further, the Husband was prohibited from taking the child from West Virginia during his parenting time.

---

[8] The Husband has filed pleadings in this case seeking the disbarment, imprisonment and imposition of monetary sanctions upon his wife's former attorney, Henry Glass.

[9] The family court found that "there is no doubt that [the Husband] will bully, degrade and infuriate every provider with whom he disagrees or who has refused to accommodate his odious and malicious conduct." This limitation was based on the Husband's persistent accusations of wrongdoing by the child's day care provider. These accusations were accompanied by "enraged, rude, disrespectful and excessively demanding phone calls" to the day care center. The Husband was denied an order prohibiting the child's day care provider from being within 1,000 miles of the child. The Husband called the child's day care provider a danger to the child and someone who engages in "erratic, mentally unstable behavior." The day care provider sought and was awarded a protective order against the Husband.

The family court concluded that

> [the Husband]'s personality disorder has in the past,
> and much more likely than not will in the future, put [the
> child] at an increased risk of harm caused by third parties
> reacting to [the Husband]'s belligerent, obnoxious and
> provoking behavior.  He simply is incapable of controlling
> himself. [The Husband] may return to Court when the child
> reaches the age of ten and is better able to protect himself
> from his father's tirades (e.g. by using a phone to call his
> mother) and/or [The Husband] has completed a regimen of
> psychotherapy, as recommended by Dr. Hudson, designed to
> augment his ability to control himself and avoid the conflict
> which he currently creates and revels in."

Upon appeal to the Circuit Court of Putnam County, the Husband sought a reversal of the family court's allocation of custody to the Wife.  Following a hearing the circuit court did reverse the family court's parenting time, finding that "there is little evidence that [the Husband] *actually* poses a threat to the well-being of the child." (Emphasis in original).  The circuit court relied upon Dr. Hudson's findings and testimony in increasing the Husband's time with his child to include overnights from Friday at 6 p.m. to Sunday at 8 p.m. every other weekend.

The circuit court's order stated as follows:

In summary, the child has never been harmed or abused while
in the custody of [the Husband].  The Court does recognize a
potential risk of subjecting the child to observe [the
Husband's] repeated engagement in conflict.  However, this
Court does not find that the *potential* for the child to witness a
dispute between his father and another adult, with a lack of
violence in [the Husband's] history, does not warrant

14

limitation of his parenting time with his child. Such potential, by itself, does not make [the Husband] an unfit parent.

Both the family court and the circuit court based their findings and conclusions on the best interests of the child. "In visitation as well as custody matters, we have traditionally held paramount the best interests of the child." Syl. pt. 5, *Carter v. Carter*, 196 W.Va. 239, 470 S.E.2d 193 (1996).

Where the two orders differ is in the impact of the Husband's uncontroverted personality disorder and his bizarre conduct in judicial proceedings on his interaction with the child. The family court, in analyzing the evidence in this case, found that there was a potential for harm to the child because of the Husband's conflict-filled relationships with others. The family court cited anecdotal evidence of the Husband's behavior, including an incident in an out-of-state airport where the Husband, Wife and child were escorted off the premises, as well as his recent arrests for harassment and trespassing. The family court relied upon the Husband's conflicted relationship with the child's day care provider, including the fact that the provider had obtained a protective order against the Husband. The family court also relied upon its first-hand observations and interactions with the Husband to reconcile the differences between the report of Dr. Thistlethwaite, which suggested that the Husband's personality disorder posed a danger to those persons threatened, and the report of Dr. Hudson, which tended to discount the purported danger because of no evidence of harm to the child.

15

Conversely, the circuit court focused on the lack of physical harm to the child to date in reversing the family court's limitations on the Husband's parenting time with the child. The circuit court placed a greater emphasis on the report of Dr. Hudson, whereas the family court's order was based more upon the recommendations and opinions of Dr. Thistlethwaite.

We believe that the family court was in a superior position to gauge the risk of harm to the child because of the Husband's peculiar behavior. The family court interacted with the Husband over an extended period of time, holding hours of hearings, reviewing hundreds of pages of pleadings and evidence and interacting with the parties at length. The circuit court's interaction was more limited in nature, with limited pleadings and one hearing on the appeal.

We are reminded that the circuit court's standard of review of the family court's order is similar to our review of the circuit court's order, and that "[i]n a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. pt. 2, *State ex rel. Lipscomb v. Joplin*, 131 W.Va. 302, 47 S.E.2d 221 (1948). We have further held that the circuit court cannot base its decision to reverse the family court on its beliefs that it may have ruled differently given the same evidence. A circuit court may not substitute its findings of fact for those of a family court judge merely because it disagrees with those findings. *See*, syl. pt. 4, in

16

part, *Stephen L.H. v. Sherry L.H.*, 195 W.Va. 384, 465 S.E.2d 841 (1995)("[A] circuit court may not substitute its own findings of fact for those of a [family court judge] merely because it disagrees with those findings.").

Applying that standard of review, we see no clear abuse of discretion on the part of the family court in how it allocated parental responsibility to the parties. We find the circuit court's assessment of error on the part of the family court to be incorrect. Because of the Husband's confirmed propensity for interpersonal conflict, we agree that the family court's concerns for the child's safety warrant restriction of the Husband's time with the child. While the circuit court was correct that there had been no actual physical harm to the child thus far because of his father's conflict-seeking tendencies, the family court recognized and emphasized that there exists potential for grave harm to this child if he is in the care, custody and control of the Husband when trouble arises. The family court's focus was keenly on the child's best interests. The family court's limitations of the Husband's contact are amply supported by the evidence, and it was an abuse of the circuit court's discretion to overrule the family court's order in this regard. We therefore reverse the order of the circuit court insofar as it relates to the Husband's parenting time and direct reinstatement of the order of the family court on allocation of parenting.

## B.

### Equitable distribution of the marital residence

During the course of the parties' marriage, the Husband and Wife resided in a home that was purchased prior to the marriage by the Wife and her mother. At no time during the parties' marriage did the Wife undertake to place the Husband's name on the deed to the home. Neither the Husband nor the Wife had the marital home appraised for its value at the time of the parties' separation. The Husband asserted a claim for one-half of the difference in value of the home from the date of the parties' separation and the asking price of the home, which was listed for sale during the pendency of these proceedings, but cited no authority for this way of valuing any interest that he may have had in the home. The Husband also sought to be reimbursed for $12,750 in improvements allegedly made to the home by him, including an entertainment center, the child's swing set and photographs of the child.

The family court found that the marital home was not marital property. The family court set the value of the home at $16,000, which figure represented the reduction in the mortgage indebtedness on the marital home prior to separation. The family court denied the request for reimbursement for improvements to the house alleged to have been made by the Husband, finding that some of the requested reimbursements were for items that were clearly not improvements to the real estate, and further finding that there was no evidence to support the increase in value of the house as a result of these improvements.

18

The family court awarded the marital home to the Wife, free and clear of any claim of the Husband. The circuit court affirmed the family court's order, finding that there was no abuse of discretion in the value assigned to the marital home or the finding that the home was not marital property. The circuit court also affirmed the family court's decision denying the Husband's request for reimbursement for improvements to the marital home.

W. Va. Code § 48-7-103 (2001) provides a statutory mechanism for distributing the property acquired during the course of a marriage.[10] The process was

---

[10] W. Va. Code § 48-7-103 states

> In the absence of a valid agreement, the court shall presume that all marital property is to be divided equally between the parties, but may alter this distribution, without regard to any attribution of fault to either party which may be alleged or proved in the course of the action, after a consideration of the following:
> (1) The extent to which each party has contributed to the acquisition, preservation and maintenance, or increase in value of marital property by monetary contributions, including, but not limited to:
> (A) Employment income and other earnings; and
> (B) Funds which are separate property.
> (2) The extent to which each party has contributed to the acquisition, preservation and maintenance or increase in value of marital property by nonmonetary contributions, including, but not limited to:
> (A) Homemaker services;
> (B) Child care services;

(continued . . .)

explained in syllabus point 1 of *Whiting v. Whiting*, 183 W. Va. 451, 396 S.E.2d 413 (1990), in which we held that

> Equitable distribution under W. Va. Code, 48-2-1, [now 48-7-103] et seq., is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets. The third step is to divide the marital estate between the parties in accordance with the principles contained in W. Va. Code, 48-2-32.

---

(C) Labor performed without compensation, or for less than adequate compensation, in a family business or other business entity in which one or both of the parties has an interest;

(D) Labor performed in the actual maintenance or improvement of tangible marital property; and

(E) Labor performed in the management or investment of assets which are marital property.

(3) The extent to which each party expended his or her efforts during the marriage in a manner which limited or decreased such party's income-earning ability or increased the income-earning ability of the other party, including, but not limited to:

(A) Direct or indirect contributions by either party to the education or training of the other party which has increased the income-earning ability of such other party; and

(B) Foregoing by either party of employment or other income-earning activity through an understanding of the parties or at the insistence of the other party.

(4) The extent to which each party, during the marriage, may have conducted himself or herself so as to dissipate or depreciate the value of the marital property of the parties: Provided, That except for a consideration of the economic consequences of conduct as provided for in this subdivision, fault or marital misconduct shall not be considered by the court in determining the proper distribution of marital property.

In the case before us, the family court performed the *Whiting* analysis, determining first that the home in which the parties resided was not a marital asset. The circuit court affirmed that ruling. Our review of the case leads us to the same conclusion. The marital home, in terms of classification as a non-marital asset or a marital asset, was correctly determined to be a non-marital asset. The house was purchased by the Wife and her mother prior to the marriage. The Wife took no steps to make this home a marital asset.

The Husband asserts a claim for the value of the improvements, appearing to argue that he is entitled to a dollar-for-dollar reimbursement for alleged improvements he made to the home. The family court found that the Husband did not meet his burden of proving to the court that there were in fact any improvements, or how those improvements would have increased the value of the marital home. The circuit court affirmed that ruling. Upon our review, we affirm the circuit court's affirmation of the family court on this assignment of error.

## C.

### Wife's failure to undergo a psychological evaluation

The Husband contends that the family court erred when it held the Wife in contempt for failing to undergo a psychological evaluation and fined her $100 for her violation of the court's order. The Husband posits that the Wife's failure to undergo this evaluation mandates that he be allocated the majority of custodial responsibility for the

parties' child. In addition, he argues that "there is no way of knowing if the child is safe, that is [sic] welfare is being attended to, or that he is happy" because the evaluation was not performed. The Wife argued that she was unable to pay for the evaluation and accepted the court's sanctions.

In *Deitz v. Deitz*, 222 W.Va. 46, 54, 659 S.E.2d 331, 340 (2008), we acknowledged that "[a]n integral part of the family court's authority to enter final orders of divorce is its corresponding power to enforce those orders through contempt proceedings." If the family court cannot enforce its orders, the court's actions are without meaning. The family court's enforcement of those orders is within the discretion of the family court.[11]

---

[11] As we stated in *Deitz v. Deitz*, 222 W. Va. 46, 59, 59 S.E.2d 331, 344 (2008),

> In this regard, we have observed that "the law is ... not to be lightly mocked," and a court may, therefore, "impos[e] whatever legal sanctions it ch[ooses] to compel the [contemnor's] acquiescence to the court's authority." *Donahoe v. Donahoe*, 219 W. Va. 102, 105, 632 S.E.2d 42, 45 (2006) (per curiam). *Accord Armstrong v. Armstrong*, 201 W.Va. 244, 248, 496 S.E.2d 194, 198 (1997) (per curiam) (directing circuit court to determine whether contemnor had ability to pay monies pursuant to divorce decree, and, if he had such ability to pay, further instructing circuit court to hold contemnor "in civil contempt with an appropriate sanction until the monies owed under the divorce decree are paid in full").

Applying our standard of review to the instant appeal, we see no clear error in the lower court's findings of fact regarding the Wife's failure to undergo the court-ordered psychological testing. We further see no abuse of the court's discretion in assessing a modest monetary sanction against the Wife. While it was the Husband's motion for the parties to undergo psychological testing, our review of the underlying record does not reveal any outward signs of psychological issues or strange behavior on the part of the Wife that would have some bearing on her parenting of the child. The Husband's conduct throughout these proceedings, however, all viewed by Judge Kelly over a period of months, is strongly supportive of his need for such an evaluation. This assignment of error is without merit and we find no reversible error on this ground.

## IV.

## CONCLUSION

For the reasons set forth herein, we reverse the order of the Circuit Court of Putnam County, insofar as it expanded the Husband's parenting time with the parties' child, and affirm the lower court's affirmation of the remainder of the family court's well-reasoned, well-documented and legally sound order of January 22, 2013.[12] We remand this case to the Circuit Court of Putnam County, with directions to remand this

---

[12] At oral argument of this appeal, both parties acknowledged that the child support established in the January 22, 2013, family court order has been reduced. The amount of child support was not assigned as error by the Husband, and we do not address the child support in this opinion.

23

matter to the Family Court of Putnam County for reinstatement of the January 22, 2013, family court order, as set forth herein.  The mandate of this Court shall be entered forthwith.

Affirmed, in part, reversed, in part, and remanded, with directions.