# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Mark V.H.,**
**Defendant Below, Petitioner**

**FILED**

**September 9, 2019**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)  No. 18-0230** (Putnam 11-D-516)

**Delores J.M.,**
**Petitioner Below, Respondent**

## MEMORANDUM DECISION

Petitioner Mark V.H.[1], by counsel Christopher S. Butch, appeals the January 26, 2018, order of the Circuit Court of Putnam County that affirmed the November 7, 2017, order of the Family Court of Putnam County. The family court precluded petitioner from having any contact with his minor son "until such time as [petitioner] has undertaken eighteen months of continuous progress in mental health treatment without getting involved in legal altercations with third parties." Respondent Delores J.M., appearing pro se, filed a response in support of the circuit court's order. Petitioner, although represented by counsel, also filed three pro se responses.[2]

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

[2] As noted above, petitioner's counsel filed an appellate brief on petitioner's behalf. Nevertheless, petitioner, acting pro se, filed three additional "supplemental" briefs (totaling 82 pages of material) with this Court. These supplemental briefs generally assert that "every judge, in this case" is mentally ill or a "domestic terrorist," and demand this Court reverse the lower courts' orders and award petitioner "trillions of dollars" in compensatory and punitive damages. Because petitioner's pro se pleadings do not comply with the West Virginia Rules of Appellate Procedure, we decline to consider them.

Petitioner Mark V.H and his ex-wife, respondent Delores J.M., have one child together, a son, who was born in 2007. Respondent filed this divorce and custody matter in the Putman County Family Court. However, then-Kanawha County Family Court Judge Mike Kelly was appointed to the case because the Putnam County family court judge was disqualified. Judge Kelly then entered a temporary order in the case.

Thereafter, on April 27, 2012, petitioner submitted a fraudulent letter to the Clerk of this Court in which he impersonated Judge Kelly and claimed that, as Judge Kelly, he had violated petitioner's rights, embarrassed the legal profession, and was vacating the temporary order and resigning his family court judge seat. Also during the spring of 2012, petitioner contacted members of this Court via e-mail, text messages, and phone calls, some of which petitioner made to the justices' home phones. In response, on May 11, 2012, the Chief Justice entered an administrative order that prohibited petitioner "from having any contact with the Court or its staff" and required that "[a]ll filings and other communications from [petitioner] shall be in writing and filed with the Clerk and not directly with the Court." Nevertheless, petitioner continued to send e-mails and to make phone calls to the members of the Court. In response, the Chief Justice entered a June 18, 2012, administrative order regarding petitioner's "VEXATIOUS AND FRIVOLOUS CONTACTS WITH COURT OFFICIALS." The order provided any further such communications would be "referred to the appropriate authorities for possible criminal prosecution." Nevertheless, petitioner thereafter sent an e-mail to the Court's administrative director.

On September 21, 2012, petitioner filed a "Motion for Recusal, Reversal of Temporary Order and Sanctions" in which petitioner claimed Judge Kelly "sat back and allowed [petitioner's mother] to die without seeing [the parties' son]." Petitioner demanded that Judge Kelly should be required to enter an "order to revive [his mother] and pay for [the parties' son's] trip to California to see [petitioner's mother] at [Judge] Kelly's personal expense."

Following extensive litigation, Judge Kelly entered the parties' January 22, 2013, final divorce order in which he concluded that petitioner's documented personality disorder necessitated that respondent have sole and exclusive decision-making authority for the parties' son. However, Judge Kelly awarded petitioner parenting time with the parties' son every other Saturday and Sunday from 9:00 a.m. until 8:00 p.m. Judge Kelly precluded petitioner from having overnight visitation with the parties' son, and prohibited petitioner from taking the child out of state. The family court found that allowing the child to spend any more time with petitioner would subject the son to danger due to petitioner's propensity to initiate conflict with other people. The family court also found that petitioner has "serious mental health issues that include a personality disorder (not otherwise specified) with narcissistic and paranoid and chronic impairment due to personality disorder." That said, the family court ruled that petitioner

> may return to Court when the [parties'] child reaches the age of ten and is better able to protect himself from [petitioner's] tirades (e.g., by using a phone to call his mother) and/or [petitioner] has completed a regimen of psychotherapy . . . designed to augment his ability to control himself and avoid the conflicts which he currently creates and revels in.

Judge Kelly also noted the following: Petitioner repeatedly made derogatory remarks to

2

Judge Kelly, such as calling him "wacky" and "an idiot." Petitioner accused Judge Kelly of running a "Kangaroo Court" and opined that Judge Kelly "should be imprisoned and impeached" or committed to a mental institution "until he does society [a] favor and passes." Petitioner also demanded that respondent's lawyer be "disbarred" and sanctioned "the sum of $10 million" for "bizarre, anti-social and malicious [conduct]." Petitioner then demanded that respondent's lawyer pay him "$10 Billion in punitive damages" and be sent to a "mental ward" for the remainder of his life. Petitioner described his own lawyer as a "documented liar" and "a lying sack of crap."

Petitioner appealed the January 22, 2013, divorce order to the circuit court, which, on May 7, 2013, affirmed the family court's order in part and reversed in part. Petitioner appealed the circuit court's order to this Court.

While petitioner's appeal of the circuit court's May 7, 2013, order was pending, the family court entered a September 26, 2013, order in which it made the following findings: (1) "petitioner will bully, degrade and infuriate every person with whom he disagrees or who has refused to accommodate his odious and malicious conduct"; (2) petitioner "will harass any and all of [his] child's service providers, generating complaints to legal officials and causing an innocent facility to increase their security and expend scarce additional funds because of [petitioner's] behavior"; (3) petitioner continues to harass respondent by making unannounced and unwelcome visits to her home or workplace or by e-mail, text, or social media; and (4) petitioner repeatedly files frivolous pleadings, often with the goal of harassment or delay. The family court found it "could pick out scores of [petitioner's] nonsensical filings" that were "vitriolic rehashings of rulings adverse to [petitioner]" and "filed for a vexatious, wanton and oppressive purpose or were intentionally designed to harass [respondent] or the [family court] and cause unnecessary delay to these proceedings."

On November 14, 2013, this Court, in *Mark V.H. v. Dolores J.M.*, 232 W. Va. 378, 752 S.E.2d 409 (2013), reversed the circuit court's May 7, 2013, order and reinstated the family court's divorce order, including the family court's decision to limit petitioner's contact with the parties' minor son. We found that the evidence in the record showed petitioner engaged in "sustained harassment of private individuals and companies as well as various public officials and entities." *Id.* at 382, 752 S.E.2d at 413. We also made the following findings with regard to petitioner's conduct:

> The disdain and rage of [petitioner] toward this Court, the entire court system and especially toward Judge Kelly, has permeated a majority of his self-filed pleadings. [Petitioner] has made a number of impossible-to-achieve and nonsensical requests and demands of the Family Court and this Court during the course of these proceedings. The following is not an exhaustive list, but illustrative of [petitioner's] conduct: (1) that Judge Kelly reincarnate his deceased mother so that she, [petitioner] and the child may have a final visit; (2) that after Judge Kelly reincarnates [petitioner's] deceased mother, that he pay for a trip for [petitioner] and his son to visit with her; (3) that Judge Kelly build a zoo in West Virginia and move the Atlantic Ocean to the State of West Virginia; and (4) that Judge Kelly pay for trips to amusement parks and other attractions for [petitioner], his child, the child's classmates and his teachers.

3

*Id.* at 384, 752 S.E.2d at 415.

By order entered November 27, 2013, Judge Kelly (1) reinstated the parties' January 22, 2013, final divorce order except as modified by subsequent orders of the family court, and (2) granted parenting time to petitioner every other Saturday and Sunday commencing at 9:00 a.m. and ending at 8:00 p.m. each day with no overnights.

On April 10, 2014, the Circuit Court of Kanawha County (Judge Kelly's home county) entered an administrative order finding that petitioner filed three "wholly frivolous and completely vexatious" actions in the circuit court. The order found that petitioner was "abusing the judicial system, costing the expenditure of significant amounts of money for attorney fees, and aggravating and annoying persons . . . without any justification or legitimate reason." In the exercise of its inherent authority, the circuit court precluded the circuit clerk from accepting any pro se civil action filed by petitioner. However, the circuit court allowed the circuit clerk to accept any pleading filed by a lawyer on petitioner's behalf.

Despite the April 10, 2014, administrative order, petitioner, in December of 2014, filed various pro se pleadings including his tenth petition to have Judge Kelly recused from this case, which, like the other nine petitions, was denied. Petitioner also filed a pleading in which he stated that Judge Kelly was "a judicial thug" and "a MENTALLY ILL PATHOLOGICAL LIAR." Petitioner then repeated his demand that Judge Kelly revive his deceased mother and that he be awarded "$1 Billion" and $100 Trillion" in punitive damages. At the same time, petitioner filed an "Emergency Motion to Have Judge [] Kelly Undergo Mental Evaluation." Shortly thereafter, petitioner filed a "Motion for Reversal" of the circuit court's order denying petitioner's motion for a mental evaluation of Judge Kelly. Petitioner then claimed he had "impeached" the circuit court and the Chief Justice of this Court in a "Citizen's Order" and, therefore, neither the circuit court nor this Court had legal standing to issue any orders.

On January 2, 2015, the family court cautiously granted petitioner additional parenting time due to petitioner's "ongoing relationship with a qualified mental health professional." Specifically, the family court ordered that petitioner be afforded parenting time every Wednesday evening from 5:30 p.m. to 7:30 p.m. However, the family court eliminated petitioner's telephone visitation with his son. In a second order, entered February 18, 2015, the family court sanctioned petitioner $1,000 for his filing of frivolous motions. In a third order, entered February 20, 2015, the family court denied a series of motions filed by petitioner that essentially sought to overturn its January 2, 2015, order. On March 20, 2015, the circuit court denied petitioner's appeal of all three orders. Petitioner then appealed the circuit court's order to this Court. We affirmed the circuit court's March 20, 2015, order. *See Mark V.H. v. Dolores J.M.*, No. 15-0350, 2015 WL 7199002 (W.Va. Nov. 13, 2015)(memorandum decision).

In April of 2015, petitioner filed a pleading directed to Putnam County Circuit Court Judge Phillip M. Stowers in which he (1) claimed Judge Stowers's orders were "evil, incompetent, arrogant and prove [Judge Stowers is] unfit to hold office; (2) reversed "all" of Judge Stowers's orders and sanctioned Judge Stowers "$100 Trillion in damages"; (3) wrongfully informed Judge Stowers that he had been impeached; (4) demanded Judge Stowers revive his mother and pay for

4

petitioner and his son "to fly to California to visit with [his mother] within one hour of this [pleading] being filed"; (5) claimed Judge Stowers must "take responsibility for [his] incredible evil misconduct and make this visit happen today"; (6) ordered Judge Stowers to "roll back time" so that petitioner could have the time he lost with his son; and, (7) ordered Judge Stowers to "immediately report to the mental ward of the nearest prison where you are to stay for the remainder of your life." Due in part to this filing, Judge Stowers and the other Putnam County circuit court judge advised the Chief Justice that they were voluntarily recusing themselves from petitioner's case. The Chief Justice of this Court then appointed Special Circuit Court Judge John W. Hatcher, Jr. to hear any appeals from the family court in this case.

Soon thereafter, petitioner filed an "emergency appeal" to the circuit court of the family court order denying him a "Father's Day Trip." By order entered in June 8, 2015, Judge Hatcher found petitioner's appeal to be "quite disturbing," "vexatious" and "a rambling, nonsensical, erratic, irrational and absurd writing which makes absolutely no sense at all, even when read and considered in a light most favorable to [petitioner]." Judge Hatcher affirmed the family court's order and then ordered that,

> [i]n consideration of the inherent authority vested in the [court] by virtue of the . . . appointment order of the Chief Justice, it is **ORDERED** that the Circuit Clerk of Putnam County, West Virginia, *shall not*, effective immediately, accept for filing, any *pro se* pleadings of any kind form or nature from [petitioner]. . . .

> It is further ordered that the aforementioned Clerk shall only accept pleadings for filings in the name of [petitioner] which are prepared and offered for filing by a lawyer licensed to practice law in the State of West Virginia and whose license is in good standing. . . .

On July 6, 2015, petitioner, appearing pro se, appealed the circuit court's June 8, 2015, order to this Court. We found that the June 8, 2015, order was not a final appealable order and, therefore, the Clerk of this Court did not docket the appeal. On July 29, 2015, petitioner sought a writ of prohibition from this Court to halt enforcement of the circuit court's June 8, 2015, order. In a final order entered November 17, 2015, the Court refused that petition.

On March 30, 2016, this Court granted Judge Kelly's motion to be relieved from this case and appointed Special Family Court Judge Sabrina Deskins in his stead.

By order entered June 3, 2016, Judge Deskins appointed Donna Pratt as the guardian ad litem for the parties' son. Ms. Pratt later testified regarding her August 24, 2016, report to the court, and her motion to be relieved from this case. Specifically, Ms. Pratt testified to e-mails sent or copied to her by petitioner in which petitioner (1) accused Ms. Pratt of displaying "incompetent behavior and unprofessional tactics"; (2) asked his counsel to seek a restraining order against Ms. Pratt that would preclude her from having contact with the parties' son; (3) asked his counsel to file a complaint against Ms. Pratt with the West Virginia State Bar's Office of Disciplinary Counsel; (4) stated that Ms. Pratt's report to the court was libelous, rude, obnoxious, demanding, and incompetent; (5) accused Ms. Pratt of retaliatory conduct; (6) asked his counsel to file a defamation lawsuit against Ms. Pratt seeking "major" damages; (7) called Ms. Pratt an "obnoxious

5

princess" and a "lunatic"; and (8) asked his counsel to have Ms. Pratt admitted to a mental health facility. Ms. Pratt further testified that petitioner "berated and screamed" at her; accused her of covering up misconduct; avoided meeting with her; and then sent multiple e-mails to her in which he demanded an immediate court order allowing petitioner to move with his son to the beach.

In an order dated August 29, 2016, Judge Deskins ordered the parties "to refrain from posting information with regard to this case or legal action or the minor child on social media while this case is ongoing[.]" Petitioner did not appeal or otherwise challenge this order.

Thereafter, petitioner sought overnight visits and permission to travel out of state with his son. In a November 30, 2016, order, Judge Deskins noted that (1) a criminal complaint had been filed against petitioner that alleged he made harassing telephone calls to a local radio station owner; (2) a restraining order was entered against petitioner due to his violation of an order not to harass a local doctor or the doctor's family; (3) petitioner made multiple internet postings that involved allegations and complaints against Judge Kelly, respondent's attorney, respondent, Judge Deskins, Guardian ad Litem Donna Pratt, and Putnam County Prosecutor Mark A. Sorsaia; and (4) petitioner filed a complaint against Ms. Pratt with the West Virginia State Bar's Office of Disciplinary Counsel, and then sent Ms. Pratt a Facebook "friend" request (which she declined).

Also in the November 30, 2016, order, Judge Deskins noted that Ms. Pratt testified that (1) petitioner claimed on Facebook that Ms. Pratt was "man bashing"; and (2) she was contacted by a radio station operator who said petitioner wanted to run an "attack news story" about her. Judge Deskins highlighted that, in open court, petitioner acknowledged his abusive internet postings about Ms. Pratt. Judge Deskins also highlighted that petitioner admitted to (1) posting comments and photos of Judge Deskins *and her children* on social media sites; (2) entering a guilty plea to a charge of trespassing; and (3) being banned from a state office building after making insulting and abusive phone calls to a state agency. Judge Deskins also noted that security at Yeager Airport had designated petitioner as a "potential disruptive visitor." Judge Deskins then found petitioner violated the August 29, 2016, order that prohibited the parties from posting information online regarding this case when he posted "false and inaccurate" information regarding counsel and Judge Deskins on his website. Judge Deskins ordered petitioner to remove any social media regarding herself, the parties, the parties' child, and counsel within twenty-four hours. Judge Deskins then denied petitioner's petition for additional parenting time on the following grounds:

> [Petitioner] has failed to evidence a substantial change in circumstances warranting a modification pursuant to [W.Va.] Code [§] 48-11-401 . . . . Therefore, all requests for overnight and out of state parenting time shall be denied.

> In particular, [the family court] ruled in the Final Divorce Order that further modification of the parenting plan should be precluded prior to the child turning [ten] years of age and being better able to protect himself and/or [petitioner] has completed a regimen of psychotherapy.

> Further, the court FINDS that a modification as requested by [petitioner] is not in the best interests of the minor child.

6

The [petitioner's] parenting time shall remain as previously ordered, other than the de facto modification of the Wednesday parenting time being modified to 5:15 p.m. to 8:00 p.m. . . . .

Finally, Judge Deskins released Ms. Pratt from her guardian ad litem duties of behalf of the parties' son. Petitioner did not appeal or otherwise challenge the court's November 30, 2016, order.

On March 3, 2017, petitioner, by counsel, again filed a petition for modification seeking additional parenting time. At that time, this case was assigned to Putnam County Family Court Judge Richard C. Witt. However, this Court accepted Judge Witt's voluntary recusal and appointed Cabell County Family Court Judge Patricia Keller in Judge Witt's stead. Judge Keller then appointed Arik Paraschos to serve as the guardian ad litem for the parties' son. At a preliminary hearing, the family court ruled that the parties could review the guardian ad litem's report at the family court's office, but could not have a copy of the report. In his brief to the Court, petitioner does not claim that he appealed or otherwise objected to this requirement.

In an April 6, 2017, "Order of Admonishment," Judge Keller found that petitioner had filed, pro se, a document purporting to sanction and remove the circuit clerk from office, "as well as making other nonsensical, irrational and absurd demands." The family court restated its prior orders prohibiting petitioner from filing pleadings or other documents pro se, and advised petitioner that it would sanction him if he filed any further pro se pleadings or documents. Petitioner does not claim that he objected to, appealed, or otherwise timely challenged the April 6, 2017, order, and we find nothing in the record to support the same.

The family court held a final hearing on petitioner's modification petition on July 26, 2017.

On August 14, 2017, petitioner, by counsel, moved to remove Mr. Paraschos as his son's guardian ad litem. The family court denied that motion and found that the best interests of the parties' son warranted an investigation by a guardian ad litem.

On August 21, 2017, Judge Keller issued an "Order Regarding Digital Recordings of Proceeding" that provided the recordings of the parties' family court proceedings would be given only to the parties' counsel due to petitioner's history of posting the contents of such recordings online to the detriment of his minor son. Judge Keller noted that, pursuant to Rule 6 of the West Virginia Rules of Practice and Procedure for Family Court, all recordings in a court file are confidential, as are all family court proceedings. Thereafter, petitioner sought a copy of the recording of the final hearing. The family court allowed petitioner's counsel to have a copy of the recording with the proviso that petitioner could view the recording, but was not to be given a copy of the recording. Petitioner does not claim that he appealed the August 21, 2017, order, and we find nothing in the record to show he objected, appealed or otherwise timely challenged this ruling.

On November 7, 2017, Judge Keller entered a sixty-four page order (the order under review) that addressed petitioner's March 3, 2017, motion for additional parenting time. In the order, Judge Keller reviewed the history of this case; petitioner's continuing destructive, harassing and belligerent conduct; and his numerous unsuccessful interactions with mental health professionals. Judge Keller then made numerous findings, five of which are of particular interest

7

with regard to this appeal.

First, Judge Keller found that petitioner anonymously filed seven false reports with Child Protective Services ("CPS") claiming respondent had engaged in child abuse or neglect of the parties' child.[3] Petitioner claimed in these filings that (1) respondent is a bad driver and is stupid; (2) respondent had the parties' son overnight in a car and then spent a week in a timeshare where she allegedly cohabited with her future husband in a bedroom across the hall from the son's bedroom; (3) respondent failed to obtain medical treatment for the son; (4) respondent once parked her car in such a way that the son had to cross the street and "almost got hit with a car"; and (5) respondent allowed mold to grow in the home she shares with the parties' son. CPS investigated these claims and found no merit to any of them. Judge Keller found that all seven reports were false and that petitioner filed them to harass respondent.

Second, Judge Keller recounted the havoc caused by petitioner when the parties' son, with the family court's permission, attended church camp for a week. While the son was at the church camp,

> [petitioner] used his position as an "on-line news source" to disrupt the camp. He had the health department inspect the camp. [The c]amp had to install cameras and put an action plan in place because of concerns that petitioner would create problems or potentially attempt to remove [his son]. [Petitioner] was told not to enter the camp property but did so and went into a dorm and took pictures. [Petitioner] contacted the camp wanting to see the child. He was told no. [Petitioner] sought permission from [the camp's] supervisor and again was told no. [Petitioner] contacted law enforcement and sat outside camp property until told to leave.

Due to petitioner's conduct, Judge Keller entered a ninety-day protective order on behalf of respondent and the parties' son that prohibited petitioner from having any contact with respondent or his son. The circuit court affirmed the entry of that protective order. The family court then extended the protective order for an additional ninety days at respondent's request.

Third, Judge Keller made detailed findings that petitioner abused guardian ad litem Arik Paraschos and attempted to have him removed from the case. Petitioner assailed Mr. Paraschos with nonsensical and irrational e-mails. Petitioner also filed an ethics complaint against Mr. Paraschos with the West Virginia State Bar's Office of Disciplinary Counsel, just as he had done with former guardian ad litem Donna Pratt. Petitioner also threatened Mr. Paraschos to the point that Mr. Paraschos would meet with petitioner only in the presence of a court bailiff.

Fourth, Judge Keller found that petitioner attempted to intimidate her in her role as the Cabell County Drug Court judge. As the drug court judge, Judge Keller had a small role in the recently-released Netflix documentary "Heroin(e)." Judge Keller was scheduled to attend a public

---

[3] In the complaints to CPS, the complainant did not identify himself. However, based on the style and/or type of the complaints, CPS concluded that all of the complaints were made by petitioner.

screening of the documentary at a movie theater in Huntington. In response, petitioner called the theater and harassed its manager claiming it should not screen the documentary because Judge Keller participated in it. Petitioner also called the theater's corporate offices, the director of the documentary, and the foundation that funded the documentary. Petitioner then filed a FOIA request with Marshall University and claimed that "Marshall is renting the theater for a presentation of Heroin(e) featuring Judge [] Keller." Petitioner asked for all documents, notes, contracts, and memos related to the screening. Petitioner then reserved two tickets for the screening. Petitioner's actions raised serious security concerns for local law enforcement, and spurred the theater's security team, Marshall University's Police Department, the City of Huntington's Police Department, and the Cabell County Sheriff's Department to have officers at the screening.

Fifth and finally, Judge Keller found petitioner "has a personality disorder that causes him to engage in belligerent, obnoxious and provoking behavior" and that he revels in conflict and purposely attempts to "intimidate court officials and others associated with his domestic cases." Judge Keller also found petitioner "engaged in harassing and threatening behavior," including "media stalking" toward Judge Kelly, Judge Deskins, Judge Keller, and the two guardians ad litem, Ms. Pratt and Mr. Paraschos.

In light of these findings, Judge Keller concluded that:

> Petitioner failed to evidence a substantial change of circumstances warranting an increase in parenting time or relief from the restrictions in place for the protection of the parties' son.

> Petitioner's request to be allowed to make education-related decisions for his son is denied. The Putnam County Board of Education has been a victim of petitioner's frivolous litigation and petitioner has been denied access to school activities until he completes a regimen of psychotherapy with a qualified individual. Petitioner presents no evidence showing he has complied with that requirement.

> Petitioner's motion to modify parenting time is not in the best interests of his son. Petitioner's "personality disorder continues to create a volatile situation which places the child at risk and at an increased risk of harm by third parties reacting to [petitioner's] belligerent and obnoxious behaviors."

> Petitioner has made no meaningful efforts to address his personality disorder.

> It would be manifestly harmful to the son to have any parenting time with petitioner until petitioner has undertaken eighteen months of continuous progress in mental health treatment.

The family court then denied petitioner's motion to increase his parenting time and, instead, suspended his parenting time with his son, and imposed several other conditions, as follows:

1. [Petitioner] shall have no contact with his son . . . until such time that he has

9

undertaken 18 months of continuous progress in mental health treatment without getting involved in legal altercations with third parties during that same time period, i.e., no phone harassment, no stalking, no threatening, no trespassing while undergoing continuous mental health treatment. Progress in mental health treatment does not mean attending therapy sessions where you sleep or where you argue with the therapist or express feelings that you are only there to learn how to deal with stupid people. [Petitioner] will make no progress in his mental treatment if he does not accept he has a personality disorder, that is antisocial in nature, and that he learns not to get pleasure out of verbally abusing and threatening people.

2. If [petitioner] is arrested, becomes uncooperative with his therapist or violates any provision about stalking or harassment, during the 18 month period the [c]ourt has required [for any future petition] for modification, the 18 month clock will start again. [Petitioner] has to understand there are consequences to his conduct, and more importantly, for [his son's] well-being. The [c]ourt wants to see 18 months of stability on the part of [petitioner] before having contact with [his son] again.

3. The [c]ourt will not consider a motion to modify parenting time for [petitioner] until the petition includes a statement from at least a master's degree level therapist who can state that he or she provided [eighteen] months of continuous treatment for [petitioner], that he has bought . . . entirely [in]to making efforts to correct his behavior and that he has not intimidated or demanded the therapist change [his or her] records to comply with [petitioner's] wishes. It is obvious from reviewing the mental health records that [petitioner] has attempted to intimidate mental health providers into giving him letters that would be helpful to his case. This behavior cannot continue and [] be considered progress.

4. Any therapist who provides treatment for [petitioner] shall be provided a copy of the [g]uardian [a]d [l]item report and this order . . . . If a therapist does not have background information on [petitioner] . . . they cannot carry out successful therapy and then provide an honest and thorough report for the consideration of a petition to modify . . . .

5. [Petitioner] shall not be permitted to acquire copies of the video or audio recordings of the family court hearings or a copy of the [g]uardian [a]d [l]item [r]eport. His constitutional rights can be adequately protected by a lawyer on his behalf acquiring any records needed for preparation of any appeals, or future modifications, without [petitioner] having access to them, since he will likely publish them.

6. [Petitioner] shall not publish any pleadings, [g]uardian [a]d [l]item [r]eports, videos or recordings of the private matters addressed in this case. [His son] is old enough and sophisticated enough to become aware of any social media postings or television or radio programs that divulge the private matters in this case. Any child in [his] position would be mortified and traumatized by these issues becoming public. [The son] has seen his father in [c]ourt in videos that were posted by his

father and the [son] referred to the video as the "attack" video.

7. [Petitioner] shall stop making irrational or impossible requests of the [c]ourt, i.e. time travel, resurrecting the dead [his mother], relocation of zoos, professional sports teams[,] or oceans. The court considers those statements examples of someone who is not mentally fit.

8. The [c]ourt shall continue in place the provision that [petitioner] is not to file pro se pleadings in this matter; filings must be made by a licensed attorney on his behalf.

9. The [c]ourt shall keep in place [its] prior order that [petitioner]'s frivolous and nonsensical filings shall be subject to sanctions.

10. [Petitioner] shall post a bond of $2,500.00 with his next filing so that [respondent] has an opportunity to hire an attorney and can seek reimbursement of fees, if she has to contend with yet another unreasonable and frivolous petition for modification. [Petitioner] shall post an additional bond of $1,500.00 to be applied toward guardian ad litem fees, as well as the cost of obtaining records and documents.

11. [Petitioner] shall be denied physical access to the Cabell County Family Court Annex, unless accompanied by counsel, or with prior permission of the [c]ourt.

12. If [petitioner] follows through on statements made to the [g]uardian ad litem that he would picket the [c]ourthouse, attorneys' or individuals' homes if he did not get his way, the [c]ourt shall consider this a violation of the provision of the Final Order in regard to stability. This conduct shall be considered for what it really is, continuing harassment of legal professionals doing their jobs and carrying out the duties of the [c]ourt.

13. Upon entry of this order, [petitioner] is specifically restrained, prohibited and enjoined from having contact with or being within 100 yards of the [g]uardian [a]d [l]item [Arik Paraschos] . . . , his law office or home.

14. [Petitioner] shall stop all forms of harassment of [respondent], her husband and family and friends. [Petitioner] should make no contact with her employer, co-workers, or customers, since this destabilizes her employment and hurts [the parties' son].

15. This [o]rder continues in effect the prohibition on public disparagement in print, posting any information on the internet, or via social media regarding the [c]ourt, the [j]udge, the [g]uardian [a]d [l]item, counsel, [respondent], and [the parties' son]. Such action shall be considered direct contempt of the [c]ourt and sanctioned as such.

11

16. [Respondent] shall have the right in the form of a [c]ourt [o]rder to travel with [the parties' son] . . . . Based on the fiasco to work out the [son's] opportunity to attend a church camp for one week this summer, there is no hope that [petitioner] would cooperate with travel documents for [the son] . . . .

17. [Petitioner] shall cease filing reports with Child Protective Services. To date he has never filed a CPS report that had any merit and they have been used to harass [respondent] and [the parties' son]. [Petitioner's] abuse of the Child Protective Services system is a form of abuse of [the son]. False reports to Child Protective Services or having police do needless safe child checks shall be considered child abuse and a violation of the provision of 18 months of progress and stability required to petition the [c]ourt for a modification of parenting time.

Petitioner appealed the family court's order to the circuit court. On January 26, 2018, the circuit court affirmed the family court's order and found it to be "the most thorough, detailed, comprehensive, and well-written order the [court] has ever encountered, and the [court] just commenced his twenty-eighth (28th) year on the [b]ench." The circuit court also found that petitioner's appeal could be addressed absent a hearing, the family court's findings were not clearly erroneous, and the law as applied to the facts by the family court was not an abuse of discretion.

Petitioner now appeals the circuit court's January 26, 2018, order that affirmed the family court's November 7, 2017, order.

In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo.*

Syl., *Carr v. Hancock*, 216 W. Va. 474, 607 S.E.2d 803 (2004).

Petitioner, by counsel, raises eight assignments of error on appeal.

Petitioner first argues that the requirement in the November 7, 2017, order that he have no contact with his son "until such time as he has undertaken eighteen months of continuous progress in mental health treatment without getting involved in legal altercations with third parties," has no basis in law or fact and is arbitrary, capricious, ambiguous, and punitive. Petitioner points out that the family court's 2013 final divorce order provided that he might get more parenting time when his son reached the age of ten if petitioner participated in a regimen of mental health treatment. Petitioner highlights that his son was ten years old when the family court entered its November 7, 2017, order. Petitioner therefore argues that the family court should have awarded him additional parenting time instead of precluding all visitation. Petitioner also claims the family court erred in focusing on the negative aspects of his mental health treatment, and in finding that petitioner's "personality disorder continues to create a volatile situation which places the child at risk and at an increased risk of harm by third parties reacting to [petitioner's] belligerent and obnoxious behaviors."

12

The family court's November 7, 2017, order is, in effect, a modification of the parties' 2013 and 2015 parenting plan orders. West Virginia Code § 48-9-401 (2001) governs the modification of parenting plan orders and allows for modifications upon a "substantial change in circumstances":

> West Virginia Code § 48-9-401(a) (2009) permits a court to modify a parenting plan order on the basis of a substantial change in circumstance that arises after the parenting plan order is entered if such change was not provided for in the parenting plan and modification is necessary to serve the best interests of the child.

Syl. Pt. 3, *Skidmore v. Rogers*, 229 W. Va. 13, 725 S.E.2d 182 (2011). A family court's modification of a parenting plan must be directed toward the needs of the child, not the needs and wants of a parent. "For a century-and-a-half, the courts of this State have been guided by the fundamental rule that, when addressing custody issues involving children, the best interests of the child trump all other considerations. It is the polar star that steers all discretion." *Brooke B. v. Ray*, 230 W. Va. 355, 361, 738 S.E.2d 21, 27 (2013). West Virginia Code § 48-9-401(d) provides that the "occurrence or worsening of a *limiting factor* . . . constitutes a substantial change of circumstances" and "measures shall be ordered . . . to protect the child or the child's parent." (Emphasis added). A "limiting factor" is defined to include acts where a parent "[h]as interfered persistently with the other parent's access to the child" or "[h]as made one or more fraudulent reports of . . . child abuse." W. Va. Code §§ 48-9-209(a)(4) and (5).

The record establishes that petitioner has repeatedly and persistently harassed respondent and others associated with respondent, and consistently interfered with respondent's parenting time to the detriment of the parties' son. Furthermore, at least seven times, petitioner made fraudulent reports of child abuse to Child Protective Services ("CPS") claiming respondent abused or neglected the parties' son. CPS investigated each of these reports and found them to be unsubstantiated, and the family court found the reports to be fraudulent, frivolous, and to the detriment of the parties' son. Problematically, respondent refuses to acknowledge or to consistently and effectively seek treatment for his mental health issues, also to the detriment of the parties' son. Aside from his argumentative claims, petitioner introduced no evidence to controvert the family court's conclusion that a substantial change in circumstances had arisen since the entry of the 2013 and 2015 parenting plan orders. Moreover, the family court's order accounted for the best interests of the parties' child, and only imposed those "constraints or conditions that the court deem[ed] necessary to provide for the safety of the child[.]" W. Va. Code § 48-9-209(b)(10). We therefore reject petitioner's first assignment of error.

Petitioner's second and third assignments of error concern the family court's ruling that petitioner "shall not be permitted to acquire copies of the video or audio recordings of family court hearings or guardian ad litem reports." Petitioner contends he wants the copies so he can publish them on his website in the public domain. Petitioner argues that the family court violated his First Amendment rights as a litigant and as a journalist because the ruling is an illegal prior restraint on the press. Petitioner also argues that the ruling violates his rights under the Fourteenth Amendment because the ruling applies only to him, and not to respondent.

13

The family court's November 7, 2017, order recites a prior order, dated August 21, 2017, that initially imposed the restrictions "designed to prohibit [petitioner] from possessing a copy, in any fashion" of court records. The family court found petitioner "has a history of discussing his domestic case on-line (on social media, his website and blog)[,]" and that petitioner has posted these court records online, under the guise of the First Amendment

> to attack [respondent] and her [new] husband, as well as various judicial officers, attorneys and guardians ad litem who have been involved in this litigation. Unfortunately, the minor child in this proceeding has seen some of those internet postings, which is upsetting to the child. The [f]amily [c]ourt must take the extraordinary measure to keep the CD recording out of [petitioner's] hands, so that it does not end up posted on-line, causing further embarrassment and harm to the minor child.

First Amendment freedoms are not absolute; they must be "'applied in light of the special characteristics of the [relevant] environment.'" *United States v. Brown*, 218 F.3d 415, 424 (5th Cir. 2000) (quoting *Tinker v. Des Moines Indep. Cty. Sch. Dist.*, 393 U.S. 503 (1969)). Thus, even though "'litigants do not "surrender their First Amendment rights at the courthouse door," those rights may be subordinated to other interests that arise' in the context of . . . trials." *Brown*, 218 F.3d at 424 (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 n.18 (1984)). Courts have recognized that our "[f]reedom of speech does not include freedom to convey messages when, where, and how one chooses. That right must be adjusted to the rights of others." *Yates v. Commonwealth*, 753 S.W.2d 874, 876 (Ky.App.1988) (citing *Breard v. Alexandria*, 341 U.S. 622 (1951)). Accordingly, various kinds of communication are subject to regulation or outright preclusion by governmental action when they run afoul of established principles of law or policy. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982).

We find that the family court narrowly tailored its order to protect the parties' minor child from embarrassment and to protect respondent from harassment and intimidation. In the context of this child custody matter, we see no infringement of petitioner's First or Fourteenth Amendment rights. *See generally Wedding v. Harmon*, 492 S.W.3d 150 (Ky. Ct. App. 2016) (order prohibiting ex-husband from sending co-parenting e-mails to third parties did not violate ex-husband's right to free speech); *In re Marriage of Olson*, 69 Wash. App. 621, 850 P.2d 527 (1993) (prohibiting ex-husband from making disparaging remarks about ex-wife to children did not violate First Amendment); *Schutz v. Schutz*, 581 So. 2d 1290 (Fla. 1991) (compelling ex-wife to encourage and nurture the relationship between the child and the noncustodial ex-husband parent did not violate right to free speech). Petitioner's publication of court records appears to be constitutionally unprotected conduct intended to harass, annoy, or intimidate respondent, judges, guardians ad litem, and others. The family court narrowly drew its order to permit petitioner's lawyer to obtain copies of court records and to allow petitioner to review the records so that he may effectively litigate his case, while simultaneously protecting respondent's right to fair, harassment-free access to the courts. Further, petitioner's conduct clearly shows that he seeks copies of recordings and court reports so that he can publish their contents in the public domain, despite the fact that such recordings and reports are, as a matter of law, "confidential and not open for public inspection[.]" W. Va. Code § 48-1-303(b) (2001). *See also* Rule 6(a) of the Rules of Practice and Procedure for

14

Family Court. Finally, and most importantly, the best interests of the parties' minor son are supported by the family court's limitation of petitioner's procurement of copies of sensitive court records given petitioner's penchant for publishing the details of his family court case on the internet for all to see to the detriment of the parties' son.

We also conclude that petitioner waived any objection to the family court's prohibition of his obtaining recordings of court hearings and copies of guardian ad litem reports. "A person may, by his or her acts or omission to act, waive a constitutional right, including the right[] of . . . freedom of speech[.]" 16 C.J.S. Constitutional Law, § 191. The family court entered its order on August 21, 2017, and petitioner never objected to, or appealed, the order. Thus, even if there had been any merit to petitioner's arguments regarding the family court's prohibition, he has waived them.

Finally, we reject petitioner's claim that the family court's ruling violates his rights under the Fourteenth Amendment because respondent may obtain copies of court recordings and reports. Petitioner does not appear to have objected or otherwise preserved this argument in the family court. Moreover, neither the family court nor the circuit court found that respondent had published any recordings or reports on the internet. Hence, there was no reason for the family court to subject respondent to the same limitations it imposed upon petitioner. Accordingly, we reject petitioner's second and third assignments.

Petitioner's fourth assignment of error concerns that portion of the November 7, 2017, order that keeps in place the prior orders limiting him from filing pro se pleadings. Petitioner argues that the order is unconstitutional and unlawful, and prevents him from seeking redress of his legal rights. Petitioner also asserts the order violates his Fourteenth Amendment rights because respondent is not subject to a similar prohibition.

This Court has emphasized that the lower courts have the authority, in extreme cases, to preclude court filings made in bad faith:

> Free access to courts is a principle predicated on the erroneous assumption that both litigants in all lawsuits have a good faith dispute. Often this is not the case, and where it is not, the mischief must be discouraged. Courts are available free of charge, so they are overused. Their overuse in turn congests the docket, resulting in justice-defying delays. In a court system burdened, even compromised, by congestion and delay we need to be particularly sensitive to mischievous overuse of the courts. Litigation designed simply to impede a party seeking payment of an obligation, spiteful and vexatious suits—these simply do not belong in court. . . .
>
> Everyone who has a good faith dispute requiring a decision by an impartial arbiter is entitled to his day in court. On the other hand, every person is not entitled to his day in court regardless of the frivolous nature of the suit. Parties whose interest in the legal process is to oppress or cheat others should be discouraged.

*Nelson v. W.Va. Pub. Emp. Ins. Bd.*, 171 W. Va. 445, 453-54, 300 S.E.2d 86, 95 (1982). *See also*, *Mathena v. Haines*, 219 W. Va. 417, 422, 633 S.E.2d 771, 776 (2006) ("While access to courts is

a recognized fundamental right, it is also a commonly recognized principle that such right of access is not without limitations."); *State ex rel. James v. Hun*, 201 W. Va. 139, 141, 494 S.E.2d 503, 505 (1997) (The "right of meaningful access to the courts is not completely unfettered.").[4]

Numerous states have adopted statutes or rules that permit restrictions on litigants who have been determined to be vexatious – that is, "persons who persistently and habitually file lawsuits without reasonable grounds, or who otherwise engage in frivolous conduct in the courts." Robin Miller, "Validity, Construction, and Application of State Vexatious Litigant Statutes," 45 A.L.R.6th 493 (2009). While this Court has not adopted a vexatious litigant rule, other courts routinely levy sanctions or fashion remedies to preclude the filing of frivolous and repetitious proceedings. *See*, *e.g.*, *In re Vey*, 520 U.S. 303, 304 (1997) (precluding Supreme Court Clerk from accepting further in forma pauperis filings "[i]n light of [pro se petitioner's] history of frivolous, repetitive filings[.]"); *Washington v. Alaimo*, 934 F. Supp. 1395, 1397 (S.D. Ga. 1996) (pro se litigant's access to courts could be limited because he "lacks the ability or will to govern his suits with the civility and order required by . . . the Federal Rules of Civil Procedure. He has wasted the time of many an innocent party and he has flippantly used the resources of the judiciary with his abusive motions filing practice."); *Rudnicki v. McCormack*, 210 F. Supp. 905, 909 (D.R.I. 1962) ("I have determined that the time has come when it is necessary and appropriate that an injunction issue, both for protection of these and other public officials against unwarranted harassment, and for the protection of the records of this and other courts against the filing of frivolous and unimportant papers."); *In re Prefiling Order Declaring Vexatious Litigant, Pursuant to I.C.A.R. 59*, 164 Idaho 586, 434 P.3d 190 (2019) (upholding restrictions on litigant who filed numerous frivolous pro se actions and frivolous pleadings); *DeNardo v. Cutler*, 167 P.3d 674, 681 (Alaska 2007) ("[T]he courts have the authority to enjoin persons engaged in the manifest abuse of the judicial process . . . . The courts may take creative actions to discourage hyperactive litigators so long as some access to courts is allowed, such as by limiting the amount of filings a litigant may make, and prescribing conditions precedent to those filings so as to determine the propriety of a suit on a case by case basis." (Quoting 42 Am.Jur.2d Injunctions § 191 (electronic edition, updated May 2006)); *Kondrat v. Byron*, 63 Ohio App. 3d 495, 496, 579 N.E.2d 287, 287 (1989) (permanently enjoining litigant from filing future pro se cases without first meeting stringent conditions); *Eismann v. Miller*, 101 Idaho 692, 697, 619 P.2d 1145, 1150 (1980) (Exercise of the right to access to the courts "cannot be allowed to rise to the level of abuse, impeding the normal and essential functioning of the judicial process. To allow one individual, untrained in the law, to incessantly seek a forum for his views both legal and secular by means of pro se litigation against virtually every public official or private citizen who disagrees with him only serves to debilitate

---

[4] The courts of this State may also impose sanctions under Rule 11 of the Rules of Civil Procedure, or Rule 11 of the Rules of Practice and Procedure for Family Court, for documents filed "to harass or to cause unnecessary delay or needless increase in the cost of litigation," posing frivolous arguments, or lacking evidentiary support. *See*, *e.g.*, *Warner v. Wingfield*, 224 W. Va. 277, 685 S.E.2d 250 (2009) (upholding Rule 11 sanction); Syl., *Daily Gazette Co. v. Canady*, 175 W. Va. 249, 332 S.E.2d 262 (1985) (under a court's inherent authority and Rule 11, "[a] court may order payment by an attorney to a prevailing party reasonable attorney fees and costs incurred as the result of his or her vexatious, wanton, or oppressive assertion of a claim or defense that cannot be supported by a good faith argument for the application, extension, modification, or reversal of existing law.").

the entire system of justice."); *Bd. of Cty. Comm'rs of Boulder Cty. v. Barday*, 197 Colo. 519, 522, 594 P.2d 1057, 1059 (1979) ("[T]he right of access to courts does not include the right to impede the normal functioning of judicial processes. Nor does it include the right to abuse judicial processes in order to harass others."). *See also* William T. Goglia, *Authority of United States District Court, under 28 U.S.C.A. § 1651(a), to enjoin, sua sponte, a party from filing further papers in support of frivolous claim*, 53 A.L.R. Fed. 651 (1981); John M. Johnson, G. Edward Cassady, III, *Frivolous Lawsuits and Defensive Responses to Them-What Relief Is Available?*, 36 Ala. L. Rev. 927 (1985); Edmund R. Manwell, *The Vexatious Litigant*, 54 Cal. L. Rev. 1769, 1778 (1966) ("It is not unreasonable, furthermore, to classify separately from other litigants those litigants with a prior history of litigiousness when they bring an action with no reasonable probability to prevail. Such a litigant is more likely to abuse the processes of the courts and to harass the adverse party than other litigants.").

That said, we need not decide the question raised in petitioner's fourth assignment of error because it is time-barred, and petitioner has waived his objections. The record below establishes that the circuit court entered its first order limiting petitioner's filing of pro se pleadings on April 10, 2014. The family court entered a similar order on April 6, 2017. Having carefully reviewed the extraordinarily lengthy record below, we find no evidence petitioner ever sought to appeal those two orders, nor does petitioner claim that he appealed or otherwise challenged those orders. The circuit court entered a second such order on June 8, 2015. Thereafter, petitioner filed a petition for an extraordinary writ to stop enforcement of the order. This Court refused petitioner's request, and we find no evidence that petitioner thereafter appealed that order. Accordingly, all three orders are final and binding. Therefore, we reject petitioner's collateral attack upon the April 10, 2014, June 8, 2015, and April 6, 2017 final orders. We also reject petitioner's cursory claim that the orders violate his Fourteenth Amendment rights given that respondent is allowed to file pro se pleadings. Unlike petitioner, neither the family court nor the circuit court found that respondent has vexatiously filed pro se pleadings. Hence, there was no reason for the family court to subject respondent to the same limitations it imposed upon petitioner.

Petitioner's fifth assignment of error challenges the requirement in the November 7, 2017, order that he post a $4,000 bond ($2,500 for respondent's attorney's fees and $1,500 for guardian ad litem fees) prior to the filing of any pleading in this matter due to petitioner's numerous and persistent frivolous filings. Petitioner claims this requirement violates his First Amendment right to seek redress of his grievances, and his Fourteenth Amendment rights given that respondent is not also required to post a bond prior to filing a pleading.

We find no error in the family court's order. West Virginia Code § 48-1-305 (2001) permits a family court to "compel either party to pay attorney's fees and court costs reasonably necessary to enable the other party to prosecute or defend the action." The lengthy record in this case shows that petitioner has filed numerous frivolous pleadings with the goals of harassment and delay. The family court's order simply provides respondent and any guardian ad litem appointed in this case with the assurance that their fees and costs will be paid when reasonably necessary to defend respondent's and the parties' son's interests. Finally, we reject petitioner's claim that the November 7, 2017, order violates his Fourteenth Amendment rights given that respondent is not required to post any bond prior to the filing of any pleadings. Neither the family court nor the circuit court found respondent had vexatiously filed any pleading, either pro se or by counsel.

17

Hence, there was no reason for the family court to subject respondent to the same limitations it imposed upon petitioner.

Petitioner's sixth and seventh assignments of error also concern the family court's treatment of petitioner as a "vexatious litigant." In petitioner's sixth assignment of error, he argues that Judge Keller violated his First and Fourteenth Amendment rights when she denied him access to the *Cabell County* Family Court Annex unless his counsel accompanies him or he has Judge Keller's permission to be there. We note this custody matter is being litigated in *Putnam County*; therefore, the court files in this case are located in Putnam County and the proceedings take place in Putnam County. However, Judge Keller's office is located in the *Cabell County* Family Court Annex. In petitioner's seventh assignment of error he argues that his First and Fourteenth Amendment rights were also violated by the family court's order (which continued in effect prior orders) prohibiting petitioner's "disparagement in print, posting any information on the internet, or via social media regarding the Court, the Judge, the Guardian Ad Litem, counsel, [respondent], and [the parties' son]."

Petitioner avers he has a First Amendment right to access the Cabell County Family Court Annex, at any time, to seek government redress of his legal grievances. Petitioner further contends that he has a right to criticize the guardian ad litem, the family court, and other court officers without fear of penalty. As authority, petitioner relies upon *Rosenblatt v. Baer*, 383 U.S. 75 (1966), where the Supreme Court said, "Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized." Petitioner asserts that the portion of the order precluding him from posting disparaging information about the family court or guardian ad litem is a "prior restraint" aimed at restricting public coverage of government functions. Additionally, he again argues that the November 7, 2017, order violates his Fourteenth Amendment rights because respondent is not subject to the same restraints.

The First Amendment does not protect false statements and frivolous litigation. *See Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 743 (1983) ("Just as false statements are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition." (Citations omitted)). "[W]hen a personal attack is made upon a judge or other court official, such speech is not protected if it consists of knowingly false statements or false statements made with a reckless disregard of the truth." *Comm. on Legal Ethics of W. Va. State Bar v. Douglas*, 179 W. Va. 490, 497, 370 S.E.2d 325, 332 (1988). "Indiscriminate accusations of dishonesty . . . do not help cleanse the judicial system of miscreants yet do impair its functioning—for judges do not take to the talk shows to defend themselves, and few litigants can separate accurate from spurious claims of judicial misconduct." *Matter of Palmisano*, 70 F.3d 483, 487 (7th Cir. 1995). As the United States Supreme Court has aptly stated, "the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection." *Garrison v. State of La.*, 379 U.S. 64, 75 (1964).

The record in this case shows that petitioner has repeatedly and vexatiously made false, derogatory, and harassing comments about the judges and guardians ad litem assigned to this case in person, in court filings, on his website, and on other social media sites. Petitioner did not make these comments to root out incompetence and corruption in the judiciary. Instead, petitioner made the comments to inspire anger and bias against the judges and guardians ad litem in an attempt to

18

persuade them to disqualify themselves from the case. "[S]tatements that are outside of any community concern, and are merely designed to ridicule or exhibit contumacy toward the legal system, may not enjoy First Amendment protection." *Douglas*, 179 W. Va. at 497, 370 S.E.2d at 332.

The family court entered its order restricting petitioner's internet postings about his case on August 29, 2016. Petitioner never objected to or otherwise appealed that order, nor does he claim he appealed that order. Accordingly, petitioner has waived any appeal of this issue. That said, we caution the State's trial courts that they cannot insulate themselves from criticism. *See Palmisano*, 70 F.3d at 487 ("Judges should hesitate to insulate themselves from the slings and arrows that they insist other public officials face . . . ."). However, as the facts of this case demonstrate, petitioner's internet postings do not evince legitimate, protected speech, because the postings were primarily knowingly false statements, or false statements made with a reckless disregard of the truth. Similarly, petitioner's visits to the Cabell County Family Court Annex were not to petition for redress of grievances or to express protected speech. Instead, as Judge Keller found, petitioner declared his intention to "picket the Courthouse, attorneys' or individuals' homes if he did not get his way[.]" Accordingly, petitioner's speech was clearly not protected speech because its purpose was to intimidate judges and court officers, and to impede the fair functioning of the courts to the detriment of respondent and the parties' child.

The family court's order that limits petitioner's internet postings about judges/court officers and his access to the Cabell County Family Court Annex furthers an important and substantial government interest: it protects the parties' minor son from embarrassment and psychological harm. It also protects respondent from harassment and intimidation, including the implication that she has prevailed in the lower courts due to a corrupt or biased judiciary. Lastly, it protects the public fisc. Petitioner is entitled to his day in court, but he is not entitled to waste the courts' valuable time and resources with frivolous pleadings and arguments. Additionally, when those frivolous pleadings and arguments rightfully fail, he is likewise not entitled to engage in outrageous, abusive speech made with the goal of pushing judges and court officers to remove themselves from his case so that he can raise the frivolous arguments anew with a replacement judge or court officer. Petitioner's actions have resulted in lost time and resources, including the necessity of appointing at least three special family court judges, one special circuit court judge, and two guardians ad litem. The time has come to say, "Enough."

Furthermore, we do not see the November 7, 2017, order as directed toward suppressing petitioner's free expression of legitimate grievances or criticism. Rather, the family court directed the order solely toward petitioner's harassing and intimidating postings *about this case*. Finally, and most importantly, we find that the restrictions placed on petitioner by the family court are incidental to its primary and essential goal: protecting the best interests of the parties' son. The voluminous record in this case clearly shows that petitioner has repeatedly demonstrated he places his own need for conflict above the needs of his minor son. Therefore, the family court's order merely preserves both petitioner's and respondent's right to access a fair, impartial judicial system that can defend the interests of the parties' son until he reaches the age of majority. Because the record in this case presents a unique and exceptional remedy for an exceptionally vexatious litigant, and because petitioner never challenged the original order imposing the restrictions on internet postings, we find no error in the family court's November 7, 2017, order.

We also reject petitioner's claim that the family court's ruling violates his rights under the Fourteenth Amendment because the family court did not preclude *respondent* from commenting about this case on the internet, or from visiting the Cabell County Family Court Annex. Unlike petitioner, there is nothing in the record to show respondent has made false, inflammatory comments intended to influence the outcome of the case on the internet, and nothing to suggest respondent has visited the office of any judge or court officer with the goal of harassment or intimidation. Hence, there was no reason for the family court to subject respondent to the same limitations it imposed upon petitioner. We therefore reject petitioner's sixth and seventh assignments of error.

Petitioner's eighth and final assignment of error concerns that portion of the November 7, 2017, order that prohibits him from filing any future reports with CPS. Petitioner argues that the order violates his right to substantive due process. Petitioner highlights that "[p]arents have a Fourteenth Amendment substantive due process right 'to raise their children without undue state interference.'" *Miller v. Mitchell*, 598 F.3d 139, 150 (3ʳᵈ Cir. 2010) (quoting *Gruenke v. Seip*, 225 F.3d 290, 303 (3ʳᵈ Cir. 2000)). Petitioner claims such a prohibition curtails his right to seek the governmental assistance guaranteed to him under the "Child Welfare Act," Chapter 49 of the West Virginia Code. Thus, petitioner contends the order on appeal deprives him of his constitutional right to care for and raise his son.

The family court's order lists seven different abuse or neglect referrals made by petitioner against respondent between January of 2014 and February of 2017. The record also shows that petitioner interfered with respondent's custody of the parties' son when he called police officers numerous times seeking "wellness" or "safety" checks for his son. The family court determined that petitioner's referrals and calls to CPS were false, designed to harass respondent, and a form of child abuse that "in itself can be the basis to modify a parenting plan."

We find no error in the family court's November 7, 2017, order. Petitioner cites to no authority that allows him to file fraudulent reports with CPS or law enforcement. The law protects only those reports made "in good faith[.]" W. Va. Code § 49-2-810. Making a fraudulent report to CPS or law enforcement may give rise to a misdemeanor offense. *See* W. Va. Code § 61-6-20(3) ("A person is guilty of reporting a false emergency incident when knowing the information reported, conveyed or circulated is false or baseless, he . . . (3) Reports to . . . [an] agency the alleged occurrence of any offense or incident which did not in fact occur[.]"). Moreover, the filing of a fraudulent report with CPS is grounds for limiting a parent's time with a minor child. W. Va. Code § 48-9-209(a)(5). Because petitioner repeatedly called the police and filed false CPS reports with the intent of harassing respondent, the family court was within its authority to preclude petitioner from filing any additional such reports.

For the foregoing reasons, we affirm the January 26, 2018, order of the Circuit Court of Putnam County that affirmed the November 7, 2017, order of the Family Court of Putnam County.

Affirmed.

**ISSUED:**  September 9, 2019

**CONCURRED IN BY:**

Chief Justice Elizabeth D. Walker
Justice Margaret L. Workman
Justice Tim Armstead
Justice Evan H. Jenkins
Justice John A. Hutchison